Good morning, Your Honors. May it please the Court, my name is Julissa Ramirez, certified law student on behalf of the petitioner, Dennis Rivera-Trigueros. I would like to reserve five minutes for rebuttal, which my colleague will deliver, and we will keep track of our time. Could you pull the mic down? Yes. Well, although, I'm sorry, but you have a total of, okay, so your time is set for the ten minutes, not counting the rebuttal. Okay, go ahead. The BIA abused its discretion in denying Mr. Rivera-Trigueros' motion to reopen based on evidence that the conditions in El Salvador had significantly deteriorated under the state of exception. The BIA made two overarching errors. First, it erred in its finding that the conditions in the country had not changed, and second, it erred in its prima facie finding. Turning first to the BIA's first error, to show materially changed country conditions, Mr. Rivera-Trigueros only needs to show that the conditions in 2024 were qualitatively different from the conditions in 2022. And under Reyes-Guerrado, this is a low threshold because the change need not be drastic, especially if the conditions were already severe at the time of the original hearing. And here, Mr. Rivera-Trigueros' evidence showed several material changes, any one of which is sufficient to require reopening, and I'd like to focus primarily on the change in Mr. Rivera-Trigueros' detention status. In 2022, the immigration judge found that Mr. Rivera-Trigueros' evidence had failed to show that he would come into the custody of Salvadoran officials. In fact, the immigration judge believed that, at most, Mr. Rivera-Trigueros would face, quote, additional screening and surveillance. In contrast, by 2024, the BIA found that Mr. Rivera-Trigueros is now likely to be detained in El Salvador under the current state of exception. And I think it's important for me to highlight what detention entails in Salvadoran detention. The 2024 evidence, which the BIA was required to accept as true, showed that Salvadoran detainees are subject to torture that is, quote, inflicted upon thousands of persons detained under the state of exception regime. And that same Cristosa report at page 252 describes that this torture is, quote, widespread and systematic, and it is part of a policy of punishment that is perpetrated by the prison guards. If I can ask you to go back for just a moment to the question of the probability that he will be detained. My understanding of the record in 2022 was that you submitted evidence that they were targeting people with tattoos. Yes, he has tattoos that are perhaps indicative of gang affiliation and that the Salvadoran authorities were targeting people with such tattoos. So, like, what is the change in the evidence on the likelihood of detention from what you had already then to what you have now? Right. So the BIA's finding that his likelihood of detention has changed is itself a change because the conditions in El Salvador have changed. And they reflect the change in the Salvadoran government's treatment of individuals like Rivera-Trigueros. Although the state of exception was in place in 2022, that in and of itself does not prohibit this court from finding a change because the comparison here is to look also at the evidence of how the conditions in confinement themselves significantly worsened and how that materially affects specifically Mr. Rivera-Trigueros' claim. And do you understand the—I mean, I may ask this of the government as well—do you understand the board to have made a finding that the likelihood that Rivera-Trigueros will be detained is different now than it was in 2022? Yes, Your Honor, and I think the BIA's own citations on this are informative. The BIA, in making that finding, specifically cited to what was Respondent's brief at pages 9 through 10, and that corresponds to our record at page 39 through 40. This is the portion— I'm sorry. This is in the new order or the old order? In the new BIA order. Okay. At C.A.R. 5. Okay. Okay. And that portion of the motion to reopen exclusively discussed the changes in El Salvador. Specifically, it discussed the changes in that now there had been a report of over 70,000 arrests, and it specifically also discussed that the President of El Salvador by that point had also been reelected unconstitutionally for a second consecutive term, thereby solidifying the permanent status of the state of exception and affecting Mr. Rivera-Trigueros' likelihood of detention. And once detained, again, the evidence also demonstrates that there was a significant change in the severity and prevalence of torture within prisons specifically. For instance, at page 1,118 of the record, which is the 2022 evidence, the Crystal Salt Human Rights Organization reported that there had been five warring deaths in custody under the state of exception. By 2024, Dr. McNamara highlighted at page 132 that there had been over 132 deaths, sorry, over 400 detainee deaths, and Crystal Salt in a separate report reported on 153 detainee deaths, all of which showed a, quote, common pattern of lacerations, hematomas caused by beatings, wounds with sharp objects and signs of choking, and most commonly death by mechanical asphyxiation. So the severity and prevalence within the prisons themselves changed, and that is a material change under Carr and under Reyes-Guarado. So I'd like to ask you a couple of questions with respect to what the BIA said about detention and the sentence that follows that. Does it make a difference that the board said that he has demonstrated a reasonable likelihood that he could be detained as opposed to he would be detained? Not necessarily, Your Honor. And I think, as you mentioned, the sentence that precedes that is informative as to what the board was reaching there as well. It found that he could be detained in El Salvador, but the evidence did not show that he would more likely than not then be tortured. And so I think it's reasonable to infer that what they meant by could is that he would more likely than not now be detained. So the following sentence goes on to say that given the number of suspected gang members detained during this state of exception, the evidence does not show a reasonable likelihood that he would be able to establish that it is more likely than not that he would be tortured. In other words, I gather what they're saying is they're just so — the numbers are great that you can't really say with any kind of certainty that he would be tortured. Right. And that was their abuse and discretion, because the evidence shows the contrary. What the evidence very clearly establishes is that this is not mere instances of abuse. It is a widespread and systematic policy. For example, page 252 notes that the most common form of torture is the practice of collective torture upon arrival. And again, at this point, the BIA has acknowledged that he will be detained. And page 534 notes that — Let me just add another comment to that. In other words, I guess what I'm getting at is to what extent or degree of certainty do you have to show at this stage in order to meet your burden on a motion to reopen? At this stage, there only needs to be a reasonable likelihood that he would more likely than not be subjected to torture. And this Court has held in Tadavosian that a reasonable likelihood is met where the facts alleged satisfy the Court that it would be worthwhile to develop the issues further at a new hearing. And especially here where Mr. Rivera-Trigueros has now shown that he will likely be detained, it is especially important to have this new hearing where he can show this new evidence not only that he is now likely to be detained, but that once in detention, the evidence is unequivocal that individuals specifically matching Mr. Rivera-Trigueros's profile are subjected to torture in the prisons. And I would point the Court to page 534 that notes that with respect to the situation of prisoners and the condition in detention centers, the Salvadoran State has adopted a systematic policy of torture towards all those detained under the state of emergency on a mere suspicion of being a gang member. Additionally, the record describes that this torture includes electric shocks, beatings, lack of breathable air, choking and strangling, and lacerations, as well as the use of blunt instruments and batons by prison guards, digging detainees into the gravel until they bleed, asphyxiation, and penetrating injuries. And is it, I mean, the more likely than not standard, which here I guess is filtered through the reasonable probability of more likely than not, but nonetheless, the more likely than not standard is a difficult one for you. So is it the systematically part of the report that you're citing that's doing the work in getting you to more likely than not? Yes. And I would push back a little on that this is a high burden. Because it is at the motion to reopen, it is only a reasonable likelihood. And so that is a lower threshold than the more likely than not. And here it is both the systematic evidence, but it's also Dr. McNamara's evidence at page 148. And because it's a motion to reopen, that had to have been taken as true by the BIA. And there he noted that it would be extremely dangerous for individuals with criminal histories, former gang members, and or individuals with tattoos to be deported to El Salvador as members of each group would face a greater than 50% chance of torture. I do see I'm running into my rebuttal, but I would like to emphasize that Mr. Rivera-Trigueros matches each of these profiles. And in disregarding this evidence, the BIA abused its discretion. Thank you. Thank you. We'll hear from the government. Good morning, Your Honors. May it please the Court. Christopher Giger for the Attorney General. I have two points. First, the conditions in El Salvador during the petitioner's May 2024 motion to reopen, or April 2024 motion to reopen, is not qualitatively different than they were on May 31st. 2022, more than two months into the state of exception. And second, Mr. Rivera hasn't shown a reasonable likelihood that he would be subjected to a particularized, non-speculative risk of torture upon removal. And to begin, I would like to highlight here that the conditions on May 31st, 2022, this was occurring more than two months into the state of exception. And they did show, particularly as my friend on the other side discussed the detention status, that this does not demonstrate or rebut the agency's initial basis for denying relief. As this Court has noted in Reyes-Corrado, in order for a change to be material, that change has to rebut the agency's basis. And indeed, the initial agency decisions, they made two findings in this regard. The first being that, as this Court noted, that the petitioner would be under surveillance, but not necessarily, that that fear overall was speculative. And secondly, which is the dispositive basis for denying relief, that Mr. Rivera didn't demonstrate that he would more likely than not be subject to torture if he were removed to El Salvador. What do we do with the board that I went over with a counsel, I mean with Ms. Ramirez? With the board's finding, I guess it's a finding or a statement where they said the Respondent has demonstrated a reasonable likelihood that he could be detained. I mean, doesn't that suggest that they did see that the evidence was different in some way? In some way, Your Honor, yes. And I think that change is one of degree. It's not a fundamental change. Well, you know, our case doesn't have to be completely radically different. You know, significantly different seems to be sufficient in certain cases. In certain cases, so long as it rebuts the initial basis for the denial of relief. And I think we see this clearly in cases like Malti and Salem where the initial evidence, and I'll use Malti as an example, where there the petitioner had only initially showed evidence of discrimination and persecution, but then the new evidence demonstrated that there would be, that there were specific instances of persecution against Coptic Christians, which is the harm he claimed, or he claimed harm from that group. And not only generally, but also specifically against him. And so that's a good example of a fundamental. You know, when I was reading the IJ's decision, I kind of noted that, you know, at some point the IJ says that, well, you know, this state of exception has only been in existence for a few months. There's a lot of opposition to it in the Salvadoran public. And, you know, that might be sufficient that things are going to change. And by the time you're removed, you know, state of exception may be gone. Your Honor, that was specific. We know now that with this new evidence that conditions have changed. The board reflects it in its statement here. Well, the immigration judge, that specific portion of the immigration judge's decision, was referring to discounting the first expert, Dr. Gonzalez's testimony. And then as the board reviewed that IJ decision in December 2022, it referred to the temporary nature of the state of exception, again, only in discounting Dr. Gonzalez's testimony and explaining that Dr. Gonzalez wasn't aware, vis-a-vis of the number of arrests of those deported and tortured under the state of exception. Don't we know now as a result of the new evidence they submitted that, you know, the state of exception has been extended at least, they say here, 22 times. I guess that's even longer now because it's still in existence today. No, Your Honor, because even in the 2024 evidence, there is, I recognize the Kristosal report does state that this is effectively a permanent measure because of these extensions. But the Kristosal report first doesn't mention that there's any fundamental change in the state of exception, being that it is still a nature, a creature of the Salvadoran Constitution, subject to extension only by the legislative assembly. And I'll point, which we do note on page 38 of our brief, that Dr. McNamara in the 2024 evidence referred to the state of exception still as a temporary measure. He suggested that it would still be, and this is on pages 129 and 130 of the record, he still referred to the state of exception as temporary and suggested that it would be, he predicted that it would be extended through 2024, and that he expressly said that if the Salvadoran government had the view that it was controlling the gangs in El Salvador, then the state of exception would end. And so that's in the 2024 evidence, and that doesn't, and so even the petitioner's new expert referred to this still as a temporary measure. But this is all to say that it. Not in the same degree. I mean, the IJ in the first hearing said there's no reasonable likelihood that this is going to remain when he's deported, when he's removed. I mean, basically the IJ credited, I know your, I understand your qualification that he's rebutting the expert, but basically the IJ said, I'm quoting, even if the respondent were removed, the powers may not be in effect at the time of such removal. And they said, well, we recently extended it for 30 days. Future extensions are uncertain as they're growing opposition. So, I mean, qualitatively it's quite different from a permanent. Well, I would respectfully disagree, Your Honor, because when the board reviewed that evidence, the board still didn't, the basis for the board's denial wasn't, it wasn't hinged on the temporary nature of the state of exception. And as this Court has explained, in order for a change to be material and qualitatively different, it does have to rebut that dispositive basis for relief. Do you think that the initial denial turned in part on the idea that it was speculative whether he would even come to the attention of the authorities and be detained? I think that was part of the decision, but it wasn't the dispositive basis. That was a finding that the initial agency decisions made, but they only found that, they found that it was speculative that he would be under surveillance. But the dispositive and the reason for denial is hinged on the fact that Mr. Rivera didn't demonstrate that he would more likely than not be subject to a particularized, non-speculative risk of torture. Well, that, I mean, that's, I guess where I'm going with this is that's the ultimate conclusion, right? Is there, is he more likely than not to be tortured? And they said no. But that, the assessment of that ultimate probability is really a product of the probabilities of the two intermediate steps in the chain, right? Will he be detained? And then if detained, will he be tortured? And it seems like when you look at the first board order and the second one, the first one said, well, you know, the first step in this chain is speculative. The second one said, you know, we think he's shown the first step in that chain or maybe could have shown it or, so that seems like a material change. So what, how do you respond to that? Well, I think it would be similar to as I've stated, Your Honor, that as you've mentioned, the overall conclusion is that he would less likely than not be subject to torture. But the second link of the chain is the dispositive finding, that he's not subject to a particularized and speculative, a non, he has a non, or excuse me, he has a speculative fear of torture. And so as you mentioned, there are two different links to the chain, but the overall, the dispositive basis for denying is that second link. And even if this Court were to find that based on this change that is material, the Court should still deny the petition because Mr. Rivera hasn't demonstrated a reasonable likelihood that he would more likely than not be subjected to a particularized, non-speculative risk of torture. Mr. Rivera's arguments ultimately hinge on the fact that the assertions that he would be subject to prison conditions, specific prison conditions, without showing that he would be particularly subject to them, and also individual instances of torture, but as this Court has said, cannot substitute for the qualitative evidence, which is what Catt requires. And beginning with the prison conditions, Your Honor, on pages 40 and 41 of the opening brief, Mr. Rivera relies predominantly on individual instances and on specific conditions in specific prisons, particularly the Terrorism Confinement Center, referred to as the CICOT, and also conditions in the Izalco and Mariano prisons. And as it relates to the CICOT, on page 309 of the record, there's an article that specifically states that the CICOT was designed and built to house the high-ranking gang members, and there's no evidence that Mr. Rivera is a high-ranking gang member, and he's actually testified to the contrary, that he hasn't been a member of a gang in over a decade. And so I recognize the petitioner's point in the gray brief that he doesn't necessarily need to show that it would be too much of a burden to demonstrate that he has to show exactly what prison he would be sent to in an entire country. But when the petitioner is relying on specific conditions that are specific to only certain confinement centers, then the petitioner does have to demonstrate that he would more likely than not be subject to those specific conditions. What do we do with Professor McNamara's declaration? The Board didn't seem to discount it or anything. They just don't discuss it. No, I disagree, Your Honor. The Board on page 4 of the record did specifically refer to Dr. McNamara's new expert report and the petitioner's contention based on these new reports, but ultimately found that, and if we're still in the prima facie portion, ultimately found that he still did not demonstrate a reasonable likelihood that he would be subject. I think Dr. McNamara talks about the systemic conditions in the prisons throughout. On page 132, Dr. McNamara does make the broad statement that the prisons are intended to inflict physical pain, physical and psychological pain. But I'll note that that specific reference on page 132, there's no citation to where he's getting that, so it reasons from reading the whole report that that's still coming from the individual instances of torture that he is reporting about. And as this Court has noted in Benedicto, individual instances of torture don't substitute for the quantitative data. And here the quantitative data show that there is still less than a 1 percent risk of death if Mr. Rivera is deported to El Salvador under the state of exception. And that is exactly the type of evidence that was before the agency initially and that this Court upheld during the first petition for review. And so here it does follow that although the petitioner asserts that we rely too much on this data, the most specific data in the record indicates that the overall risk is still less than 1 percent if Mr. Rivera is sent back. And again, I'll highlight Benedicto. It wasn't just the risk of death, which there is evidence of that, but overcrowding conditions, lack of food, other means of making life very difficult for the prisoners. Certainly, Your Honor. And that evidence was also before the agency and the Court in the initial proceedings. As we note in our brief, overcrowding was at some facilities six times in the May 2022 evidence. There was evidence that there was inadequate food. There was evidence that medical symptoms or medical treatment would be withheld. And this is all in the May 31, 2022 evidence. And the agency and this Court still found that the most specific data on the risk of torture was the statistics as it related to the risk of death. And so using that exact data now for the prima facie analysis, it still supports the agency's determination that the overall risk to Mr. Rivera is still low. And I will note that Catt deferralized... So what we should take from your argument is that, okay, so the Board did say that he could be detained, but we don't know really what that means. Is that right? That's correct, Your Honor. And even... No, they may put him up in a swanky place. Perhaps. I don't know if I would use that, if I would quite say that. But for all we know, as you mentioned, the Board said he could be detained. We don't know exactly what that means. But even assuming it does mean that he will be confined to a detention facility, whichever it may be, he hasn't shown that he would be subject to a particularized risk of torture. The McNamara Declaration is fairly specific as to general conditions in El Salvador. It says they're intended to inflict physical and psychological pain on inmates as a form of punishment that goes beyond the deprivation of liberty, and then goes on to say 400 people have died in captivity. Well, isn't that enough to get through the door on a motion? It's not deciding the case, but it may be enough. Mainly because, Your Honor, this is not different. This is the same type of evidence that was before the agency in the first, between IJ and the Board and before this Court. There's still less than 1% risk of death, still evidence of overcrowding, evidence of, frankly, deplorable conditions throughout. But the petitioner's arguments ultimately assert that whether any deportee from the United States to El Salvador that has tattoos, any deportee that has criminal history, and any deportee that has former gang allegiances will be tortured. And as Judge Miller, you've noted, Congress has set a very high bar for cat deferral, and here the petitioner is, the Board did not abuse this discretion. Unless the panel has any more questions. Thank you, Mr. Giger. Thank you. Ms. Herrera. Good morning, and may it please the Court. Adriana Herrera on behalf of the petitioner. I have two points on rebuttal, and I'd like to begin by addressing the government's erroneous contention that Mr. Rivera-Trigueros has not demonstrated a particularized risk of torture in Salvadoran prisons. Both under this Court's precedent and the record, it is clear that Mr. Rivera-Trigueros has demonstrated the required particularized risk. There are two cases in particular that we feel are instructive on this point, both when V. Holder and Hosseini V. Gonzalez establish that where an individual can demonstrate that they are a member of a group which is facing torture in the country of removal, and the government will be able to identify them as a member of that group, they have met the requisite particularized risk of torture in the country of removal. And the record supports this finding as well. Mr. Rivera-Trigueros, it is undisputed, will be arriving to El Salvador as a former gang member with a gang-related tattoo and a criminal record. All of these points place him at a nearly guaranteed risk of detention upon arrival in El Salvador. That's the record at 147. And it is clear that Mr. Rivera-Trigueros will be detained, as the BIA found, upon arrival in El Salvador and will subsequently be tortured upon that detainment. I'd like to secondly address the government's contention that prison conditions are not widespread and Mr. Rivera-Trigueros has not demonstrated a risk of being detained in two or three particular prisons. Firstly, that has never been the standard for whether or not an individual will be tortured in a particular prison upon removal. Hosseini and V, as I mentioned, both demonstrate that if an individual will be removed to a country identified as a member of a group which will face torture, they do not need to demonstrate that they will be subjected to a particular prison. I'm sorry, they do need to show that it's more likely than not that they, as an individual, will be tortured. And so if the evidence is, I mean, maybe the answer is the evidence isn't confined to particular prisons, but insofar as there is evidence about particular prisons, that's only relevant if there's evidence that those are the prisons he's going to go to, isn't it? Correct, Your Honor. But the record is clear that the torture is widespread and systematic, affecting all prisons in El Salvador. The record at 252 makes clear that it is, quote, widespread and systematic, and it is, quote, part of a policy of punishment, which is carried out by officials of the prison administration across El Salvador more broadly. And secondly, it is also unclear, even within El Salvador, who is being held within each particular prison. The record at 209 makes clear that the government itself has no record of where any detainee under the state of accession is. Is there any evidence in the record that suggests that U.S. detainees, you know, people who are removed from the United States to El Salvador, are treated harsher than local gang members who are arrested and imprisoned? Your Honor, yes. Dr. McNamara's report makes clear that individuals who are arriving as deportees from the United States will face a significant risk of harm or death by state actors upon arriving in El Salvador. But is that greater than what local gang members in El Salvador might face? Or is it just the same, they're just treated as gang members? Your Honor, the risk is different for Mr. Rivera-Trigueros because he is arriving as a deportee from the United States. Firstly, because upon arrival to El Salvador, DHS has an information-sharing program. This is the record at 131 paragraph 88 where the government, the United States government, will share information about Mr. Rivera-Trigueros' prior convictions and prior gang affiliation, making it almost certain, nearly guaranteed per the record, that he will be detained upon arrival in El Salvador. And that's different from an individual who might be in El Salvador and could possibly be swept up in, you know, police activity more generally. But Mr. Rivera- I guess my question was, does there anything in the record that suggests, well, he might go to Facility X as opposed to Facility A that, you know, is worse? Is there anything like that in the record? Your Honor, that's not in the record because the Salvadoran government specifically and intentionally conceals information about where individuals are held in the state of exception. Again, the record at 209 makes clear that the government itself intentionally conceals this information. Individuals who are already living in El Salvador are unable to locate where their family members who are detained in El Salvador are being held. And this is an intentional policy on behalf of the Salvadoran government in order to carry out an authoritarian state of exception for individuals like Mr. Rivera-Trigueros. Okay. We respectfully ask that this court remand to the BIA with instructions to reopen according to the points we've made today. Thank you. So Ms. Herrera and Ms. Ramirez, you're representing your client pro bono through the court's pro bono program. And the court thanks you for your service. We thank all counsel for their helpful arguments and the cases submitted. Thank you.
judges: THOMAS, PAEZ, MILLER